# Nos. 22-1622, 22-1845

In The United States Court of Appeals For The Fourth Circuit

## DEWBERRY ENGINEERS INC.,

### Plaintiff–Appellee,

### v.

## DEWBERRY GROUP, INC. (f/k/a Dewberry Capital Corporation),

### Defendant–Appellant

On Appeal From The United States District Court
For The Eastern District of Virginia
Civil Action No. 1:20-cv-610 (LO-IDD)

## RESPONSE BRIEF OF APPELLEE DEWBERRY ENGINEERS INC.

Arthur E. Schmalz
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Ave. NW,
Washington, DC 20037
202-955-1500
*aschmalz@huntonAK.com*

Elbert Lin
Stephen P. Demm
Brian A. Wright
David M. Parker
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219-4074
804-788-8200
*elin@huntonAK.com*
*sdemm@huntonAK.com*
*wrightb@huntonAK.com*
*dparker@huntonAK.com*

*Attorneys for Plaintiff-Appellee Dewberry Engineers Inc.*

# TABLE OF CONTENTS

TABLE OF CONTENTS.......................................................................... ii

TABLE OF AUTHORITIES ................................................................ iii

INTRODUCTION ...................................................................................1

STATEMENT OF THE ISSUES............................................................3

STATEMENT OF THE CASE................................................................4

I.    The parties sue each other for trademark infringement, and enter a settlement agreement memorializing Dewberry's superior rights. ...................................4

    A.    Dewberry is founded before DG and performs real estate development and related services under registered "Dewberry" marks.....................4

    B.    The parties sue each other for trademark infringement, agreeing that they perform similar services under confusingly similar marks...........6

    C.    The Prior Litigation ends with a settlement memorializing Dewberry's superior trademark rights. .....................................................................8

II.   A decade later, DG rebrands despite the CSA and Lanham Act, ignoring Dewberry's existing rights and objections. ...................................................10

    A.    DG begins rebranding in 2017. ............................................................11

    B.    The PTO rejects DG's "Dewberry Group" application, and DG promises not to breach the CSA or infringe Dewberry's trademarks.13

    C.    DG continues rebranding and attempting to register the Infringing Marks, ignoring several Dewberry objections and other "red flags.".14

    D.    DG's use of "Dewberry" marks causes actual confusion, harming Dewberry's reputation........................................................................19

III.  Dewberry files this action and prevails at every stage. .................................21

    A.    The district court awards summary judgment for Dewberry and grants a permanent injunction. ......................................................................22

B.     The district court finds that DG willfully infringed, and disgorges nearly $43 million in profits, plus attorneys' fees and costs ..............22

SUMMARY OF ARGUMENT ...................................................................24

ARGUMENT ...........................................................................................26

I.     The district court properly granted summary judgment on Dewberry's breach of contract claim ..............................................................26

    A.     DG breached the CSA. .................................................................26

    B.     These breaches injured Dewberry. ................................................31

II.     The district court properly granted summary judgment on Dewberry's trademark infringement claim. ...............................................32

    A.     There is a likelihood of confusion between the parties' marks ..........33

    B.     DG's "prior use" defense is barred and fails on the merits ..............43

III.     The district court properly exercised its discretion in granting the permanent injunction. ........................................................................45

IV.     The district court properly exercised its discretion by awarding $43 million in disgorgement of profits ...................................................47

    A.     The district court properly applied the *Synergistic* factors. .............48

    B.     The district court properly exercised its "broad discretion" in considering the profits of the entire DG enterprise ..........................53

    C.     The district court properly accounted for costs .............................57

V.     The district court properly awarded Dewberry fees and costs. .............59

CONCLUSION ........................................................................................61

CERTIFICATE OF COMPLIANCE .........................................................63

CERTIFICATE OF SERVICE ..................................................................64

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Farm Bureau Fed'n v. Ala. Farmers Fed'n,*
  935 F. Supp. 1533 (M.D. Ala. 1996) ................................................................60

*Am. Rice, Inc. v. Producers Rice Mill, Inc.,*
  518 F.3d 321 (5th Cir. 2008) ....................................................................47, 55

*Amp Inc. v. Foy,*
  540 F.2d 1181 (4th Cir. 1976) ...............................................................40

*Attkisson v. Holder,*
  925 F.3d 606 (4th Cir. 2019) ..................................................................44

*Beer Nuts, Inc. v. King Nut Co.,*
  477 F.2d 326 (6th Cir. 1973) ..................................................................44

*Bennett v. Garner,*
  913 F.3d 436 (4th Cir. 2019) ..................................................................56

*Blumenfeld Dev. Corp. v. Carnival Cruise Lines, Inc.,*
  669 F. Supp. 1297 (E.D. Pa. 1987) .........................................................46

*CareFirst of Md., Inc. v. First Care, P.C.,*
  434 F.3d 263 (4th Cir. 2006) ..................................................................41

*Commc'ns Satellite Corp. v. Comcet, Inc.,*
  429 F.2d 1245 (4th Cir. 1970) ...........................................................38, 39

*Dayton Progress Corp. v. Lane Punch Corp.,*
  917 F.2d 836 (4th Cir. 1990) ..................................................................34

*Exclaim Mktg., LLC v. DirecTV, LLC,*
  674 F. App'x 250 (4th Cir. 2016) ............................................................50

*Express Homebuyers USA, LLC v. WBH Mktg., Inc.,*
  791 Fed. App'x 396 (4th Cir. 2019) ........................................................59

*Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.,*
  778 F.3d 1059 (9th Cir. 2015) ................................................................46

*Ga. Pac. Consumer Prods., LP v. Von Drehle Corp.*,
618 F.3d 441 (4th Cir. 2010) ................................................................42

*Gaudreau v. Am. Promotional Events, Inc.*,
511 F. Supp. 2d 152 (D.D.C. 2007)........................................................52

*Georgia-Pacific Consumer Prods. LP v. von Drehle Corp.*,
781 F.3d 710 (4th Cir. 2015) ...................................................26, 59, 60

*Grayson O Co. v. Agadir Int'l LLC*,
856 F.3d 307 (4th Cir. 2017) ........................................35, 37, 41, 45

*Hana Fin., Inc. v. Hana Bank*,
574 U.S. 418 (2015)................................................................................45

*Healix Infusion Therapy, Inc. v. Helix Health, LLC*,
747 F. Supp. 2d 730 (S.D. Tex. 2010)...................................................32

*Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*,
43 F.3d 922 (4th Cir. 1995) ...........................................................32, 45

*Marble Techs., Inc. v. Mallon*,
290 Va. 27 (2015) ..................................................................................27

*Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*,
316 U.S. 203 (1942)...............................................................................57

*Murphy Door Bed Co., Inc. v. Interior Sleep Sys., Inc.*,
874 F.2d 95 (2d Cir. 1989) ....................................................................50

*Mya Saray, LLC v. Al-Amir*,
831 F. Supp. 2d 922 (E.D. Va. 2011) ....................................................60

*Osem Food Indus. Ltd. v. Sherwood Foods, Inc.*,
917 F.2d 161 (4th Cir. 1990) .................................................................40

*PBM Prods., LLC v. Mead Johnson & Co.*,
639 F.3d 111 (4th Cir. 2011) ..........................................................45, 46

*Perini Corp. v. Perini Constr., Inc.*,
915 F.2d 121 (4th Cir. 1990) .................................................................34

*Pizzeria Uno Corp. v. Temple*,
   747 F.2d 1522 (4th Cir. 1984) ....................................................*passim*

*Pocahontas Min. Ltd. v. CNX Gas Co.*,
   276 Va. 346 (2008) ..........................................................................31

*Reid v. Boyle*,
   259 Va. 356 (2000) ..........................................................................28

*Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc.*,
   405 F. Supp. 2d 680 (E.D. Va. 2005), *aff'd*, 227 F. App'x 239 (4th
   Cir. 2007) .................................................................................33, 38

*Resorts of Pinehurst, Inc. v. Pinehurst Nat'l Corp.*,
   148 F.3d 417 (4th Cir. 1998) ..........................................................32

*Rosetta Stone Ltd. v. Google, Inc.*,
   676 F.3d 144 (4th Cir. 2012) ..........................................................33

*RXD Media, LLC v. IP Application Dev. LLC*,
   986 F.3d 361 (4th Cir. 2021) .....................................................32, 41

*Sara Lee Corp. v. Kayser-Roth Corp.*
   81 F.3d 455 (4th Cir. 1996) ............................................................33

*Scotch Whisky Ass'n v. Majestic Distilling Co.*,
   958 F.2d 594 (4th Cir. 1992) ..........................................................60

*Shell Oil Co. v. Com. Petroleum, Inc.*,
   928 F.2d 104 (4th Cir. 1991) ........................................53, 54, 55, 56

*Shinaberry v. Saul*,
   952 F.3d 113 (4th Cir. 2020) ..........................................................28

*Spectrum Ass'n Mgmt. of Tex., L.L.C. v. Lifetime HOA Mgmt. L.L.C.*,
   5 F.4th 560 (5th Cir. 2021) .............................................................60

*Synergistic Int'l, LLC v. Korman*,
   470 F.3d 162 (4th Cir. 2006) ....................................................*passim*

*TM Delmarva Power, LLC v. NCP of Va., LLC*,
   263 Va. 116 (2002) ..........................................................................31

*Troublé v. Wet Seal, Inc.*,
179 F. Supp. 2d 291 (S.D.N.Y. 2001) ................................................. 12

*Verisign, Inc. v. XYZ.COM LLC*,
891 F.3d 481 (4th Cir. 2018) ....................................................... 59, 60

*Worrie v. Boze*,
191 Va. 916 (1951) ......................................................................... 31

**Statutes**

15 U.S.C. § 1055 ................................................................................. 4

15 U.S.C. § 1057(b) ................................................................. 8, 9, 29

15 U.S.C. § 1115(a) ......................................................................... 44

15 U.S.C. § 1115(b)(4) .................................................................... 34

15 U.S.C. § 1116(a) ......................................................................... 32

15 U.S.C. § 1117 .............................................................................. 56

15 U.S.C. § 1117(a) ................................................................. *passim*

Lanham Act .............................................................................. *passim*

Va. Code Ann. § 54.1-400 ............................................................... 28

**Other Authorities**

6 McCarthy on Trademarks and Unfair Competition ("McCarthy") §
32:121 (5th ed.) ............................................................................ 32

7 Callmann on Unfair Competition, Trademarks and Monopolies and
26:37 (4th ed.) .............................................................................. 34

## INTRODUCTION

The opening brief of Dewberry Group, Inc. ("DG") rests on a warped view of the prior litigation between the parties. According to DG, the parties previously sued each other in 2006 (the "Prior Litigation"), but then decided their marks were not likely to be confused, and agreed to "coexist" happily ever after. In actuality, DG (then "Dewberry Capital") itself claimed that the marks were confusingly similar, and the entire Prior Litigation was a battle for superior rights.

The parties resolved that case with a "Confidential Settlement Agreement" ("CSA")—not a "Coexistence Agreement"—recognizing that appellee, Dewberry Engineers, Inc. ("Dewberry"), had superior rights. The CSA prohibited DG from challenging Dewberry's registered marks, while allowing Dewberry to use them "at any time for any services … it chooses." By contrast, the CSA limited DG to "Dewberry Capital," which it could only use outside of Virginia, Maryland, and Washington, D.C., never in connection with architectural or engineering-related services, and only when paired with a distinguishing column/capital logo. The CSA also required DG to abandon its attempts to register "Dewberry Capital" for real estate development services.

DG did not honor the CSA. It first used "Dewberry Capital" in Virginia, in connection with architectural and development services, and without the column logo. Then DG rebranded in 2017, and its president directed its general counsel to

1

register a new "Dewberry Group" mark—without informing him of the Prior Litigation or the CSA. When Dewberry objected, DG's general counsel apologized and promised to stop. DG didn't. It continued rebranding, and applied to register four new "Dewberry" marks, all of which were rejected by the U.S. Patent and Trademark Office ("PTO") as confusingly similar to Dewberry's. Despite these "red flags," and more, DG kept forging ahead.

This litigation ensued, and Dewberry prevailed at every stage. After carefully reviewing the law and uncontroverted facts, the district court properly granted summary judgment for Dewberry on liability for trademark infringement and breach of the CSA. It then entered an injunction and held a trial on monetary relief, awarding disgorgement of profits and attorneys' fees. In awarding disgorgement, it found the trial evidence further confirmed DG's willful infringement, and that DG's testimony "throughout trial" was "not credible," "troubling," and "strain[ed] credulity."

On appeal, DG opts for quantity over quality, attacking nearly every finding the district court made—many of which were discretionary or are reviewed only for clear error. Some arguments are too cursory to be preserved (and also wrong), and what remains rests on a distorted view of unrebutted facts, controlling law, or both. For example, DG relies on an untenable reading of the CSA, arguing that because it allows "Dewberry Capital" in certain circumstances, it somehow allows *any* mark

2

incorporating the word "Dewberry." DG also resurrects its "senior user" argument from the Prior Litigation, which is barred by the CSA and fails anyway. And DG repeatedly invokes a "surname" defense that, on its face, applies only to surnames *not* used as marks.

This Court should affirm.

## STATEMENT OF THE ISSUES

1.      Did the district court properly grant summary judgment for Dewberry on Dewberry's contract claim?

2.      Did the district court properly grant summary judgment for Dewberry on Dewberry's infringement claim?

3.      Did the district court properly exercise discretion in granting Dewberry a permanent injunction?

4.      Did the district court properly exercise discretion in awarding Dewberry disgorgement of profits?

5.      Did the district court properly exercise discretion in awarding Dewberry fees and costs?

## STATEMENT OF THE CASE

I.   **The parties sue each other for trademark infringement, and enter a settlement agreement memorializing Dewberry's superior rights.**

    A.   **Dewberry is founded before DG and performs real estate development and related services under registered "Dewberry" marks.**

Dewberry was founded in the mid-1950s, initially as a civil engineering and surveying firm in Northern Virginia. JA7341 ¶8; JA2476. It grew rapidly, expanding its services into virtually all aspects of real estate development—including site selection, acquisition, and development, *e.g.*, JA2835-44 ¶¶17-27, 30-31, JA7622-62, JA3742-50, planning, zoning, and land use entitlements, *e.g.*, JA7326 ¶15; JA3751-53, architecture and interior design, *e.g.*, JA2335 ¶8, JA2340 ¶23, JA3751-53, and construction management, JA7329 ¶22. Dewberry provides these services itself and through affiliated entities under common ownership and control using Dewberry's marks under intercompany licenses. JA2344-45 ¶¶5-6, JA3724-41.[1] One such affiliate is "Dewberry Real Estate Services," JA2828 ¶4, which has developed, managed, or leased more than $100 million in commercial real estate, JA2829-44 ¶¶5-10, 12-31; JA7600-611, JA7692-96. Dewberry now has 2000+ employees in 50+ offices. JA7341 ¶8. It operates throughout the U.S., including in Georgia, JA2327 ¶¶3-4, Virginia, JA2368-72 ¶¶8-22, JA2374 ¶¶ 27-28,

---

[1] These related companies' uses "inure to the benefit of the registrant," Dewberry. *See* 15 U.S.C. § 1055.

4

Florida, JA7330-32 ¶¶25, 29-34, and South Carolina, JA3710-11 ¶9, where DG operates.

Dewberry owns two federally registered DEWBERRY® marks, one for "Dewberry" and the other for "Dewberry" paired with a "berry" logo (the "Dewberry Marks"):



JA1437-38; JA1628-29. These marks are registered for "real estate development" and an array of related services. *Id*.

The marks are featured on virtually all Dewberry communications, work product, and marketing materials. JA2344-45 ¶5. Between 2015 and 2019, Dewberry spent $125 million promoting them. JA3697-98 ¶¶7-12. Branding studies show that consumers in the real estate industry "refer to the firm simply as 'Dewberry,'" associating the name/mark with "knowledge, quality and strong client service." JA7743. *See also* JA7773. Dewberry has also received countless honors and awards for its development services and expertise, including recognition in the Congressional Record and by the Virginia General Assembly for its "innovative land-development process," JA2473-76, and more recently, "Southeast Design Firm of the Year." JA7330 ¶24, JA7336 ¶45. To protect its marks, Dewberry has a detailed Brand Guide and trademark usage and logo guidelines, which it reinforces

through diligent supervision and employee instruction.   JA2350-51 ¶¶20-21; JA7710-68.

DG was founded by John Dewberry in 1989, as "Dewberry Capital."  JA293. Operating primarily in Georgia, Virginia, South Carolina, and Florida, JA1221-23, DG provides commercial real estate development services similar to Dewberry, including site selection, acquisition and development, JA296 (Fig. A), planning, zoning, and design, JA3248-50, and construction and property management, JA296 (Fig. A).  *See also* JA470-74; JA1209-10, JA1214-23.  DG has also performed architectural and interior design services under its "Studio Dewberry" sub-brand since 2017, led by an "in-house architect,"  JA2608-09; JA2612; JA2544-62.

### B. The parties sue each other for trademark infringement, agreeing that they perform similar services under confusingly similar marks.

Dewberry and DG first clashed in 2006, when DG (then "Dewberry Capital") threatened to sue Dewberry.  JA3713-16.  DG's cease-and-desist letter—titled "Likelihood of Confusion regarding DEWBERRY Trademarks"—asserted that "a likelihood of confusion or mistake exists between the parties' respective marks." JA3714-15.  It admitted that DG's unregistered "Dewberry Capital" mark was "extremely similar" to Dewberry's registered marks "because of the common use of the predominant element 'Dewberry.'"  JA3715.  It further admitted that the parties' services "are legally related …, and travel in the same channels of commerce."  *Id.*

6

But it argued the resulting confusion injured DG, not Dewberry, claiming common law rights that trumped Dewberry's registered marks.  JA3714.

Dewberry agreed the marks were confusing and sued DG for trademark infringement, commencing the Prior Litigation.  JA2425-48.  DG counterclaimed for common-law infringement, claiming the Dewberry Marks "so resemble [DG's] DEWBERRY CAPITAL mark … as to be likely to cause confusion, mistake, or deception when used in connection with real estate development services."  JA2463-64.  DG further admitted that its "real estate development services" were the same as those specified under the Dewberry Marks, including "real estate development … and real estate site selection" services.  JA2461 ¶5.  But it again argued that this confusion injured DG, not Dewberry, because its "Dewberry Capital" mark had priority.  JA2463 ¶17.  DG's repeated acknowledgment of this likelihood of confusion was the **first red flag**[2] later identified by the district court.  JA4370-71.

DG's counterclaim also admitted the PTO had refused DG's application to register "Dewberry Capital," citing "a likelihood of confusion" with Dewberry's registered marks.  JA2463-64 ¶¶23-24.  This was the district court's **second red flag**.  JA4371.

---

[2]  After trial, the district court identified nine "'red flag' facts and circumstances alerting [DG] to the illegality of its conduct."  JA4370.  These same "red flags" were also in the summary-judgment record, as discussed in SOC §§I-II.

7

**C.** **The Prior Litigation ends with a settlement memorializing Dewberry's superior trademark rights.**

In February 2007, the parties resolved the Prior Litigation through the CSA, JA1197-206, which, given its restrictions on DG, was the district court's **third red flag**, JA4372-73. The CSA allows Dewberry to use its registered marks freely, and prevents DG from challenging these registrations:

> 4. Dewberry may use its DEWBERRY marks and names at any time for any services or products it chooses throughout the United States and elsewhere.
>
> …
>
> 8. [DG] … shall withdraw any pending challenges to Dewberry's federal trademark registrations, and shall not challenge or take action against Dewberry's federal trademark registrations.

JA1198-99 ¶¶B.4, B.8.

Dewberry's "federal trademark registrations" referenced in ¶B.8 grant Dewberry an "exclusive right to use the registered mark[s]" in connection with "the services specified in the certificate[s]." 15 U.S.C. § 1057(b). As noted above, Dewberry's certificates specify "real estate development" and other related services. JA1379-80, JA1441-42.

By contrast, the CSA strictly limits DG's use of "Dewberry":

> 2. Except as provided in Paragraph B.3 … [DG] may use the DEWBERRY CAPITAL name and mark in connection with its promotion, offering and performance of real estate development services ….

3.  To the extent that [DG] performs any … real estate development or related services in [Virginia, D.C., or Maryland], it shall do so only under the name and mark DCC and not under the name or mark DEWBERRY CAPITAL.

…

5.  [DG] will expressly abandon any pending applications to register the DEWBERRY CAPITAL mark for real estate development and/or real estate related services ….

6.  [DG] will not use the word DEWBERRY … in connection with any architectural or engineering services.

…

10.  Where feasible, DCC shall continue to use its column logo [] …. DCC shall not use a logo or design mark that depicts a "dewberry" or "berry" ….

*Id.*

This was an "acceptable compromise" to Dewberry, "because the 'Dewberry Capital' name coupled with the column logo suggested that [DG] was primarily a private equity or financial services firm, as opposed to engaged in real estate development related matters."  JA2850 ¶13; JA3829.

Dewberry also agreed not to oppose DG's then-pending applications to register five specific Dewberry-related marks:

12.  … Dewberry does not consent … to DCC's attempts to register the marks in the following applications:   DEWBERRY CESINGER HOLDINGS,   DEWBERRY   MANAGEMENT   SERVICES, DEWBERRY PARKING, DEWBERRY HOTELS, and DEWBERRY CAPITAL ….  Dewberry agrees, however, not to … oppos[e] any of the Pending Applications.

9

JA1200. But these applications were not seeking to register marks for real estate development services. *See, e.g.*, JA1760 ("Dewberry Capital" application in ¶B12 for "Equity capital investment; funds investment, investment management, [and] investment of funds for others").

Finally, the parties agreed to dismiss their claims in the Prior Litigation, JA1198-99 ¶¶B.7-B.8, and released each other from any claims that "could have been asserted" there, JA1200-01 ¶¶B.14-B.15.

## II. A decade later, DG rebrands despite the CSA and Lanham Act, ignoring Dewberry's existing rights and objections.

Following the 2007 settlement, DG operated as "Dewberry Capital" as required by ¶B.2 of the CSA. JA1215. It did, however, perform real estate development services in Virginia under that name, rather than "DCC," in violation of ¶B.3. This included submitting materials in connection with development approvals or entitlements, JA2613, JA2703-20, JA3681-94, JA2787-2826; advertising commercial real estate, JA3667-75; and negotiating the purchase, sale and/or subdividing of land, JA3620-30.

DG also used "Dewberry Capital" in connection with architectural services in Virginia and elsewhere, in violation of ¶B.6. This included submitting floor plans to the Charlottesville Board of Architectural Review, JA2613-30; executing an "Architect's Certificate" for a hotel, JA2667; and correcting architect's drawings, JA7840-51.

**A.     DG begins rebranding in 2017.**

In September 2017, DG went further, deciding that "Dewberry Capital" was not a good "match" for its "real estate development services," as "Capital" "frequently" caused DG to be mistaken for a "private equity investment firm." JA1214. Without informing Dewberry, it rebranded to the following "Dewberry Group" mark:



DG also later adopted three "sub-brands": "Dewberry Office," "Dewberry Living," and "Studio Dewberry" (collectively, with "Dewberry Group," the "Infringing Marks"):



Rebranding was important to DG. The "Studio Dewberry" mark, in particular, was a "top priority," JA3223, and "huge differentiator" from competitors, JA3265. It provided a "high quality" image, like the "Mercedes emblem" on automobiles, JA7371-74 at 94:22-97:13. This sub-brand covered "everything from architecture … to product development," JA2584-86, for "all major development projects," JA2612.

When rebranding began, John Dewberry did not inform DG's then-general counsel, David Groce, of the Prior Litigation or the CSA. JA3826. Instead, he asked

11

Groce to "do a search" for related trademarks.  JA3216-17; JA3183-85 at 245:16-247:16.  Groce responded with his findings later that day, which—despite heavy redaction by DG—reveal that Groce discovered Dewberry.  JA3219-20.  Even after receiving Groce's findings, John Dewberry still failed to inform Groce of the Prior Litigation or the CSA.  JA3826.[3]

The same day, another DG employee warned Jamie Dewberry—Principal of Studio Dewberry, JA2586, and John Dewberry's wife, JA3186 at 248:22—of a Dewberry affiliate.  Ms. Dewberry responded that John Dewberry agreed it was a Dewberry affiliate, but "says we are good."  JA3218-20.

Despite these warnings, DG began using the "Dewberry Group" and "Studio Dewberry" marks in email signatures and architectural plans in December 2017.  *See, e.g.,* JA2544-62.  These warnings from DG employees were the district court's **fourth red flag**.  JA4373.

---

[3] Groce later claimed he believed the rebranding was "probably" permissible, JA409 at 80:11, but DG conspicuously refused to provide "full disclosure" of Groce's redacted findings, as would be required to invoke an advice-of-counsel defense.  *Troublé v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 304 (S.D.N.Y. 2001).  Dewberry objected to any reliance on Groce's purported mental state, JA3991, and the district court correctly precluded DG from using similar tactics at trial, JA4260-62 at 30:18-32:18, after DG conceded it was "not relying on [an] advice of counsel defense," ECF237 at 142.

**B.** **The PTO rejects DG's "Dewberry Group" application, and DG promises not to breach the CSA or infringe Dewberry's trademarks.**

During rebranding, DG applied to register "Dewberry Group" with the PTO for "[c]ommercial real estate development services." JA1859-64. The PTO rejected this application on December 20, 2017, "because of a likelihood of confusion" with the Dewberry Marks. JA1841. It explained that the "dominant wording DEWBERRY" in both marks was "identical in sound, meaning and essentially identical in appearance" and the parties' services were "highly related." This rejection was the district court's **fifth red flag**. JA4373-74.

A week later, in its first cease-and-desist letter, Dewberry demanded that Groce withdraw the application, reiterating the CSA's restrictions and "strong likelihood of confusion" with Dewberry's marks. JA3806-24. This letter was the district court's **sixth red flag**. JA4374.

Groce responded on January 11, 2018, "regret[ting] any concern" he caused, and claiming he had not been "aware of the prior litigation or the [CSA]," and "ha[d] no intent to infringe [Dewberry's] valid trademark rights or breach the … settlement agreement." JA3826. He further promised "not to attempt to register the term DEWBERRY GROUP for real estate development services," or to use "Dewberry Group" "in connection with any present or future real estate development in Virginia, Maryland, or [DC]." *Id.* Instead, he promised to "use DCC or something

13

else that is not confusingly similar to [Dewberry's] marks." *Id.* Groce's apology was the district court's **seventh red flag**. JA4375-77.

### C. DG continues rebranding and attempting to register the Infringing Marks, ignoring several Dewberry objections and other "red flags."

In February 2018, DG abandoned its first "Dewberry Group" application as Groce had promised. JA1839. But it continued rebranding with the Infringing Marks, using "Dewberry Group" and "Studio Dewberry" marks on all "existing & future marketing material," JA3226-37, including "all new leasing materials," JA3238-40. It later used these marks on new letterhead, business cards, email signatures, uniforms, and property signs. JA7786-838.

Despite Groce's promises, DG also applied to register four new "Dewberry" marks in April 2018: "D Dewberry Group," "Studio Dewberry," "D Dewberry Living," and "D Dewberry Office." All four were for real estate-related services. JA2067-72; JA2114-19; JA2320-25; JA1830-35. Shortly after, the PTO required DG to disclaim the words "Group," "Studio," "Living,' and "Office" (meaning DG would no longer claim exclusive rights to those descriptive terms), leaving "Dewberry" as the only distinctive element. JA2056-58; JA2080; JA2310-13; JA1820-23.

In June 2018, Dewberry sent its second cease-and-desist letter, demanding that DG withdraw the applications for these new marks. JA2563-68. Dewberry

14

warned that DG was intentionally infringing Dewberry's marks, breaching the CSA, and breaking Groce's recent promises.  JA2565-67.

DG refused to abandon the applications, claiming for the first time that the parties' marks weren't confusingly similar, and that the CSA allowed free use of "Dewberry" marks other than "Dewberry Capital."  JA2571.

Dewberry responded with a third cease-and-desist letter in July 2018, insisting again that DG abandon its unlawful "Dewberry" marks.  JA3832.  It explained that DG had misread the CSA, and that DG's new marks only increased the likelihood of confusion by eliminating "Capital"—which provided the financial connotation serving to distinguish the parties' marks.  JA3829.  Dewberry also warned that DG's marks had already "caused confusion in both the Charlottesville [Virginia] area and the Northern Virginia area."  JA3831.

Dewberry's additional cease-and-desist letters were the district court's **eighth red flag**.  JA4377.

Receiving no response from DG, Dewberry challenged DG's applications at the PTO.  JA2053; JA2307; JA1818.   The PTO subsequently refused these applications multiple times—the district court's **ninth red flag**.  JA4377-78.

The PTO first rejected the "Studio Dewberry" mark in July 2018, again due to a "likelihood of confusion" with Dewberry's marks.  JA2078-80.  Like "Dewberry Group," "Studio Dewberry" was "confusingly similar" to Dewberry's marks, and

the parties' services were "similar and related," particularly Studio Dewberry's "interior and exterior design for real estate." JA2079.

The PTO then refused DG's three remaining applications in the spring of 2019, also due to a "likelihood of confusion" with Dewberry's marks, which it found "greatly similar." JA2017-19; JA2271-74; JA1782-84. It again found the parties' services were related, citing evidence they were "often associated with a single source and targeted at the same customers." JA2017-43; JA2271-97; JA1782-808. DG challenged those rejections, but the PTO reaffirmed them—twice. JA1874-18, JA1871-73, JA1919-40; JA2128-72, JA2125-27, JA2173-94; JA1638-82, JA1635-37, JA1683-704.

Undeterred, DG continued rebranding, using the Infringing Marks for, among other things:

- New signs at properties and development sites, *see, e.g.,* JA1215-16; JA333-34, JA2602-03, JA331;

- A new website, JA468, touting its "experience in architecture & design," JA2587-94; *see also* JA3263-69, JA2604-12;

- A blast email to DG's contacts, including in Virginia, introducing its "new branding and website," JA2573-76;

- A new email domain ("@dewberrygroup.com"), signature blocks, and letterhead, JA3075-76 at 124:13-125:22;

- Exterior and interior design drawings, promotional materials, and communications with government regulators and tenants, JA464, 467-70; JA1215-16, 1218-1223; JA1260-63 ¶¶90-98; JA2544-62; JA7409-13; JA3026-27 ¶¶21-22; JA2407; JA7855-58; and

16

- Numerous leasing and financing solicitations to prospective tenants, brokers and lenders, "for all of [John] Dewberry's properties," JA467-70; JA3269-571, JA3572-3614, JA3631-66.

Some of DG's leasing solicitations were to Dewberry customers or development collaborators,[4] including commercial brokers such as JLL, JA3316-44, CBRE, JA3472-519, Avison Young, JA3345-56, Cushman & Wakefield, JA3420-71, Colliers, JA3357-68, and Coldwell Banker, JA3369-77; and tenants such as Jones Day, JA3545-71, Del Frisco's Double Eagle Steakhouse, JA3520-44, and the U.S. Postal Service, JA3316-44.

Visually, DG's rebranded advertising closely resembled Dewberry's:



---

[4] JA2838-39 ¶20, JA2840 ¶23, JA2843-44 ¶30; JA3703-05 & JA3834-35; JA7350 ¶¶7-9.

17

| Dewberry | Dewberry Group |
|----------|----------------|
|  |  |

| Dewberry | Dewberry Group |
|----------|----------------|
|  |  |

| Dewberry | Dewberry Group |
|----------|----------------|



18

JA1191; JA2358-61 ¶¶43-47.

**D.    DG's use of "Dewberry" marks causes actual confusion, harming Dewberry's reputation.**

Unsurprisingly, DG's use of "Dewberry" marks caused actual confusion among Dewberry's clients and others.

One example involves a DG development project in Charlottesville, Virginia. Using the Infringing Marks, DG provided services relating to both real estate development and architecture.[5]  It also displayed the marks in a public presentation, JA2703-20; advertisements, JA2593, and leasing solicitations, JA3631-59.  As a result, at least seven representatives from the University of Virginia—a top Dewberry client—mistakenly believed this project belonged to Dewberry (one as recently as 2021), despite Dewberry's efforts to dispel the confusion.  JA2369-72 ¶¶12-22.  This was particularly concerning because of widespread negative publicity about DG's Charlottesville project.  JA2372-74 ¶¶23-28.  News articles described it as an "eyesore" and "blight," JA2751-52, a "long-languishing" "skeletal building," JA2731, "violat[ing] building code," JA2743, and containing "so many rats" that "it looked like the ground was moving," *id*.

---

[5] This included signing a development agreement (defining DG as the "Developer"), JA3681-94, JA2787-826, and submitting architectural plans, *e.g.*, JA2544-62, JA2613-30.

Another confusion incident occurred in 2020, when a reporter emailed Dewberry about a "Dewberry Group" development in Jacksonville, Florida. JA3836-39. This project too received negative press and complaints. One article highlighted stormwater violations that polluted a nearby river, JA2782-86, resulting in a fine and consent order, JA2400-04, and commercial tenants complained repeatedly of construction-related flooding, JA7852-53, JA7855-57. This confusion undermined the tens of millions of dollars Dewberry spent growing its Florida-based water-quality and development-related services. JA7331-34 ¶¶29-40.

Other confusion incidents include:

- A businesswoman demanded compensation from Dewberry for injuries sustained at a DG property. JA2725-29.

- A rental business contacted Dewberry about DG's failure to pay a bill. JA2723-24.

- A DG commercial tenant sent Dewberry a letter, which Dewberry forwarded to John Dewberry. JA2721-22.

- A prominent businessman asked Dewberry's CEO about his affiliation with a DG property, and another individual asked this CEO for employment at the property. JA7344-45 ¶¶19-21.

- An architect forwarded John Dewberry an article about a Dewberry board member, presuming affiliation with DG. JA3676-78. When Groce confirmed that the architect was confused, John Dewberry responded "cool," JA3677, and did not inform Dewberry.

- A contractor confused Dewberry with DG in Atlanta, which was also relayed to DG. JA3679-80.

20

- "[P]otential clients and professionals" repeatedly asked the manager of Dewberry's Atlanta office about his affiliation with DG's properties. JA2329-30 ¶13.

In addition, a survey by Dewberry's expert found that over 20% of respondents associated the "Dewberry Group" mark with Dewberry's marks. JA2859-3010.[6] DG conducted no confusion survey.

These confusion incidents, too, were concerning due to negative press about DG and John Dewberry's business practices, which injured the reputation Dewberry had built over 65 years. JA2352-64 ¶¶26-55. For example, a Bloomberg article titled "Emperor of Empty Lots" described John Dewberry as "a polarizing figure" and "a developer who won't develop," referring to DG's vacant or derelict development sites. JA2761-81. It also described John Dewberry's "volatile" workplace temperament, JA2775, and recounted a "profane rant [he] recorded on the voicemail of a contractor [that] circulated merrily among Atlanta real estate professionals," JA2778.

## III.    Dewberry files this action and prevails at every stage.

Dewberry filed this action in May 2020, claiming breach of contract and trademark infringement/unfair competition under the Lanham Act and Virginia state law. JA34.

---

[6] The district court rejected DG's *Daubert* challenge to this survey, JA4011-17, and DG does not contest this ruling.

### A.    The district court awards summary judgment for Dewberry and grants a permanent injunction.

Based on the facts discussed in the Statement of the Case ("SOC") §§I-II, *supra*,[7] the court granted summary judgment for Dewberry, and denied summary judgment for DG, as to liability.  JA4086-4105.  It held that DG had breached the CSA (¶¶B.2, B.3, B.6, and B.10) and infringed Dewberry's marks.  *Id*.[8]  The court ordered trial on the issue of monetary relief.  JA4106.

The court then granted a permanent injunction.  JA4151-62.  Among other reasons, it explained that "Dewberry Group's infringement, coupled with its negative publicity, damages Dewberry's reputational standing."  JA4155.

### B.    The district court finds that DG willfully infringed, and disgorges nearly $43 million in profits, plus attorneys' fees and costs.

The case proceeded to a three-day bench trial on damages.  In awarding disgorgement of profits under the Lanham Act, the court found that DG "engaged in bad faith, intentional misconduct," "pervasive[ly]" breaching the CSA "in the face of multiple red flags which were cited by the Court on summary judgment … and bolstered at trial."  JA4394.  It also cited John Dewberry's "pattern of claiming ignorance," JA4372, and found his "testimony throughout trial was not credible,"

---

[7] The facts in SOC §§I-II were all in the summary-judgment record unless otherwise noted.

[8] This ruling also granted summary judgment on Dewberry's state-law infringement claim, and state- and federal-law unfair competition claims, as the analysis was the same for each.  JA4095-96.

or, at a minimum, constituted "willful blindness," JA4374.  Similarly, it found that "Groce's testimony throughout the trial was not credible," "troubling," and "strain[ed] credulity."  JA4374, 77.

In calculating its award, the court considered not just DG's financial statements (which showed $0 in profits), but also those of the Ownership Entities. JA4384-88.  These single-purpose entities, also owned by John Dewberry, owned the properties managed by DG, and formally recognized the profits from DG's infringement.  *Id.*  The court described this arrangement as "non-arms' length" and inconsistent with "economic reality."  JA4387.  The district court did not order disgorgement from these entities, but rather used the profits distributed to them (earned from DG's services using the Infringing Marks) to calculate the disgorgement award against DG.  JA4384-88.

The court then reduced Dewberry's requested award by 20%, explaining that not all of the Ownership Entities' profits were sufficiently related to DG's infringement.  JA4388-92.  In total, it awarded $42,975,725.60 in profits.  JA4395.

The court also held that this was an "exceptional case" warranting an award of fees and costs under the Lanham Act.  JA4393-94.  After briefing on the amount, the court awarded $3.76 million in fees.  JA4432.  It held that Dewberry's counsel had billed a reasonable number of hours, but reduced their rates by 35%.  JA4423-27.  Finally, it awarded $153,592.09 in costs.  JA4431-32.

23

## SUMMARY OF ARGUMENT

I.    The district court properly granted summary judgment on Dewberry's breach of contract claim based on uncontroverted evidence.

A.    DG breached four CSA provisions, and any one of these breaches justifies the court's ruling.   DG breached: ¶B.3 by performing real estate development and related services in Virginia under "Dewberry" marks instead of "DCC"; ¶B.6 by using "Dewberry" marks "in connection with any architectural … services"; ¶B.10 by failing to use the "column logo"; and ¶B.2 by performing development-related services under a "Dewberry" mark other than "Dewberry Capital."   DG is wrong that by allowing limited use of *certain* "Dewberry" marks, the CSA allowed free use of *all* "Dewberry" marks.  If DG could use *all* "Dewberry" marks, it would have been superfluous to allow *certain* examples.

B.    These breaches injured Dewberry's reputation, which entitled it to an injunction.  Dewberry did not need to calculate money damages to prevail.

II.    The district court properly granted summary judgment on Dewberry's trademark infringement claim based on uncontroverted evidence.

A.    The court properly held that the parties' marks create a likelihood of confusion.  Based on uncontroverted evidence, it correctly reasoned that Dewberry's marks are strong; the parties' marks, services, and advertising are similar; DG intended to infringe; and the marks caused actual confusion.

24

B.      DG's prior use argument is barred by the CSA.  Regardless, DG would need to "tack" to obtain priority—an argument DG waived, and which fails anyway.

III.    The district court acted within its discretion by granting an injunction. DG's misconduct irreparably harmed Dewberry's reputation, Dewberry's disgorgement award is not an "adequate remedy at law," and both the balance of hardships and the public interest favor preventing future misconduct.

IV.   The district court properly exercised its discretion by disgorging $43 million in profits.

A.   The district court properly considered the *Synergistic* factors and, in its discretion, ordered disgorgement.

B.   In exercising its broad equitable discretion to "enter judgment for such sum as the court shall find to be just," the district court properly considered the profits of DG's affiliated Ownership Entities.  These huge profits were generated by DG's use of the Infringing Marks, while DG itself reported losses.  Finding this a "non-arms' length" arrangement, which defied "economic reality," the court was within its discretion to consider the finances of the entire enterprise.  And no "veil piercing" was needed; the court did not order disgorgement from these entities, but simply considered their finances.

C.   The district court properly accounted for costs.  It was DG's burden to establish costs, and its expert declined to do so.  So the district court adopted

Dewberry's calculations, which accounted for costs even though it wasn't Dewberry's burden.

V.    The district court properly exercised its discretion in awarding attorneys' fees based on DG's bad-faith, willful infringement.  DG claims the district court failed to apply all three discretionary *Georgia-Pacific* factors.  But the third factor is a catch-all, allowing ultimately for a "case-by-case" inquiry that depends on the "totality of the circumstances."  Willful infringement is a circumstance that warrants fees, as this Court and others have long recognized.

## ARGUMENT

**I.    The district court properly granted summary judgment on Dewberry's breach of contract claim.**

### A.    DG breached the CSA.

The district court correctly held that DG breached ¶¶B.3, B.6, B.10, and B.2 of the CSA, each of which independently justifies summary judgment.

**¶B.3.**  The district court correctly held that DG breached ¶B.3, which requires DG to perform any "real estate development or related services" in Virginia, Maryland, or DC "only under the name and mark DCC" and not "Dewberry Capital."

DG plainly performed real estate development services in Virginia under marks other than DCC.  *See* SOC at 10, 19-20.  DG does not claim otherwise. Opening Br. 49.

26

Instead, DG tries to escape the plain text by turning to "pre-execution correspondence" purportedly limiting this restriction to "the public-facing name of a project." Opening Br. 49. But that is barred by Virginia's parol evidence rule, *Marble Techs., Inc. v. Mallon*, 290 Va. 27, 33 (2015), as well as the CSA's prohibition on "argu[ing] that there were any other written or oral understandings or agreements," JA4093 (quoting JA1203 ¶B.22). And regardless of what happened earlier in negotiations, JA1123, the parties later agreed to "start over," choosing the terms of ¶B.3 instead, JA1129.

**¶B.6**. The district court correctly held that DG breached ¶B.6, which prohibits DG from "us[ing] the word DEWBERRY … in connection with any architectural or engineering services." DG did exactly that. Using multiple "Dewberry" marks, DG submitted floor plans to the Charlottesville Board of Architectural Review, executed an "Architect's Certificate," and corrected architect's drawings. SOC at 10. It also touted "Studio Dewberry" as specializing in "architecture" and employing an "in-house architect." SOC at 6, 11.

DG claims some of these activities are not "architectural services" because they purportedly do not require an "architectural license." Opening Br. 48-49. But DG cannot use "Dewberry" in connection with "*any* architectural services," not just those requiring a license. JA1198 ¶B.6. Nor does the plain meaning of "architecture" say anything about a license. https://www.merriam-

webster.com/dictionary/architecture (defining "architecture" as "the art or science of building"). And Virginia law does not define the "practice of architecture" to require a license either, as the district court noted. JA4091 (quoting Va. Code Ann. § 54.1-400). Further, the above examples were, at the very least, "*in connection with*" architectural services, which the CSA forbids. *Id.* And one of them *did* require a license—DG's "architect" signed an "Architect's Certificate" as "an authorized and licensed Architect." JA2667. (This was actually false, since the architect's license had lapsed. JA472).

DG also again invokes parol evidence, Opening Br. 9, which is barred by the parol evidence rule and CSA, *supra* at 27.

**¶B.10**. The district court also correctly held that DG breached ¶B.10, which required DG to "continue to use its column logo" "where feasible." DG stopped using this logo when it rebranded, and instead used a "D" that actually reinforced the word "Dewberry." SOC at 11.

DG does not dispute it was "feasible" to continue using the column, but claims "where feasible" is too vague to enforce. *See* Opening Br. 49-50. But DG waived this argument by failing to raise it below. *Shinaberry v. Saul*, 952 F.3d 113, 124 n.5 (4th Cir. 2020). Regardless, only "'reasonable certainty'" is required, *Reid v. Boyle*, 259 Va. 356, 367 (2000) (citation omitted), and "where feasible" is sufficiently certain.

DG also argues if the CSA really required the column logo, then the clause prohibiting the berry is surplusage. Opening Br. 8. Not so. It independently bars DG from using the berry logo—either together with the column or whenever the column is not "feasible."

**¶B.2.** Finally, the district court correctly held that DG breached ¶B(2):

> Except as provided in Paragraph B.3, below, DCC may use the DEWBERRY CAPITAL name and mark in connection with … real estate development services ….

After rebranding, DG performed various real estate development services under names other than "Dewberry Capital," like "Dewberry Group" and "Studio Dewberry." SOC 16-18.

DG does not dispute this. Opening Br. 47-48. It instead argues that the word "may" in ¶B.2 merely *permits* the use of "Dewberry Capital," and does not *prohibit* any other mark. *Id.*

As the district court correctly held, this reading is belied by the CSA as a whole. JA4094, JA4100-01. For starters, ¶B.8 prohibits DG from "challeng[ing] or tak[ing] action against Dewberry's federal trademark registrations." These registrations grant Dewberry an "*exclusive right* to use the registered mark[s]" in connection with "the services specified in the certificate[s]." 15 U.S.C. § 1057(b) (emphasis added). Those certificates specify "real estate development" and numerous related services. JA1289-90, JA1441-42. By contrast, ¶B.5 requires DG

29

to "expressly abandon" its attempts to register Dewberry Capital for "real estate development."  By agreeing not to challenge Dewberry's registrations (and to abandon its application), DG agreed not to use *any* "Dewberry" marks for "real estate development" without Dewberry's permission.

¶B.2 is a carve-out from this broad prohibition.  It allows DG to use "Dewberry Capital," and nothing else, because, as DG itself acknowledges, "Capital" suggests financial services.  SOC at 11.  And ¶B.3 prohibits even that mark in Virginia, Maryland, or D.C.—the region where Dewberry is headquartered, *e.g.*, JA2473-74.  ¶B.10 further requires DG to use a distinguishing column logo, which fits with "Dewberry *Capital*."  By contrast, ¶B.4 allows Dewberry to use its "Dewberry" marks "at any time for any services or products it chooses throughout the United States and elsewhere."  The import of these provisions is clear— Dewberry can use "Dewberry" freely for development-related services, while DG can use it only as the CSA specifically allows.

DG points repeatedly to ¶B.12, which actually supports Dewberry.  Opening Br. 1-2, 9, 20, 27, 47, 55.  ¶B.12 merely prohibits Dewberry from opposing DG's applications for marks like "Dewberry Cesinger Holdings," and a different "Dewberry Capital" mark—which are *not* for real estate development services.  SOC at 9-10.

30

In DG's view, ¶B.12 somehow means *all* "Dewberry" marks are fair game,
*e.g.*, Opening Br. 47-48, but it means the opposite. If DG could use *all* "Dewberry"
marks, there would be no need to allow *these* "Dewberry" marks in particular. The
same is true for ¶B.2: if DG could use *all* "Dewberry" marks, there would be no
need to specifically allow "Dewberry Capital." *See Pocahontas Min. Ltd. v. CNX
Gas Co.*, 276 Va. 346, 353 (2008) ("[T]here is a presumption that the contracting
parties have not used words needlessly."). The word "may" in ¶B.2 doesn't require
a different result. *TM Delmarva Power, LLC v. NCP of Va., LLC*, 263 Va. 116, 121
(2002) (courts "construe 'may' and 'shall' as permissive or mandatory in accordance
with the subject matter and context'") (citation omitted). The only party that can use
*all* Dewberry marks is Dewberry. JA1198 ¶B.4.

## B.     These breaches injured Dewberry.

DG also claims Dewberry failed to establish "nominal damages" or "lost
profits" from DG's breaches. *See* Opening Br. 46-47. But to prevail on this contract
claim, Dewberry had to prove "injury," not money damages, as the district court
correctly explained. JA4089.

Here, uncontroverted evidence showed injury to Dewberry's "reputational
standing," as the district court found. JA4103-04; SOC at 19-21. What is more, the
court found that injury, which is inherently difficult to quantify, constituted
"irreparable harm" warranting an injunction. JA4398-403; *see also Worrie v. Boze*,

31

191 Va. 916, 929 (1951) (breach remedied by injunction because "inability to prove actual damage is one of the grounds upon which equity intervenes"). Indeed, that is often the case with breaches of contracts concerning trademark rights. *See, e.g.*, *Healix Infusion Therapy, Inc. v. Helix Health, LLC*, 747 F. Supp. 2d 730, 739 (S.D. Tex. 2010) ("When a settlement agreement not to use a trademark is breached … the legal remedy of damages is inadequate due to the continuing injury to … goodwill …."); *cf* 15 U.S.C. § 1116(a) (establishing presumption of irreparable harm for trademark infringement).

## II. The district court properly granted summary judgment on Dewberry's trademark infringement claim.

The district court properly granted summary judgment on Dewberry's trademark infringement claim—holding that uncontroverted evidence showed the Infringing Marks were likely to cause confusion. JA4095-504.

Contrary to DG's claims, Opening Br. 20, "summary judgment is as appropriate in a trademark infringement case as in any other case," 6 McCarthy on Trademarks and Unfair Competition ("McCarthy") § 32:121 (5th ed.). Indeed, this Court has affirmed summary judgment for plaintiffs many times. *See, e.g.*, *RXD Media, LLC v. IP Application Dev. LLC*, 986 F.3d 361, 373 (4th Cir. 2021); *Synergistic Int'l, LLC v. Korman*, 470 F.3d 162, 170 (4th Cir. 2006); *Resorts of Pinehurst, Inc. v. Pinehurst Nat'l Corp.*, 148 F.3d 417, 422 (4th Cir. 1998); *Lone*

32

*Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 935 (4th Cir. 1995).

### A.      There is a likelihood of confusion between the parties' marks.

The district court carefully considered all nine likelihood-of-confusion factors under *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 153 (4th Cir. 2012), and correctly found they weighed definitively in Dewberry's favor based on uncontroverted evidence.  This is consistent with DG's own prior admission of a likelihood of confusion, which the PTO confirmed by repeatedly rejecting DG's attempts to register the Infringing Marks.  *See* SOC at 7, 13-16.

### 1.      Dewberry's marks are strong.

The district court correctly concluded that Dewberry's marks are strong, increasing the likelihood of confusion.  JA4097-98.  It properly reasoned that "'Dewberry' neither suggests nor describes the services provided by Plaintiff," meaning "the mark is arbitrary, which is conceptually strong."  JA4098.  *See also Sara Lee Corp. v. Kayser-Roth Corp.* 81 F.3d 455, 464 (4th Cir. 1996) (arbitrary marks, like "Camel" cigarettes or "Apple" computers, are "inherently distinctive, and thus receive the greatest protection").  The PTO's registration of Dewberry's marks without proof of secondary meaning also evidences their strength.  JA4097-98; s*ee also Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc.*, 405 F. Supp. 2d 680, 691 (E.D. Va. 2005), *aff'd*, 227 F. App'x 239 (4th Cir. 2007)

(registration without proof of secondary meaning "is persuasive evidence of a mark's conceptual strength") (citation omitted).

Moreover, Dewberry presented unrebutted evidence that "Dewberry" has acquired a strong secondary meaning—meaning the public associates this mark with Dewberry's services. *Perini Corp. v. Perini Constr., Inc*., 915 F.2d 121, 125 (4th Cir. 1990). This evidence included $125 million in advertising from 2015-2019 alone, brand recognition studies, commercial success, awards, and more. SOC at 5.

The district court also correctly rejected DG's assertion that Dewberry's marks embody just a surname. JA4097-98. That occurs only when a mark's "primary significance" is as a surname. *Id.* (quoting 7 Callmann on Unfair Competition, Trademarks and Monopolies and 26:37 (4th ed.)). Dewberry's unchallenged branding studies show that consumers primarily associate "Dewberry" with high quality development-related services, and not a surname, SOC at 5. The court also rightly noted that "Dewberry" is a also berry. JA4097.

Equally unavailing is DG's repeated reliance on the "statutory defense allowing someone to use his or her name." Opening Br. 30. This defense applies for use of a surname "otherwise than as a mark." 15 U.S.C. § 1115(b)(4). *See also Dayton Progress Corp. v. Lane Punch Corp.*, 917 F.2d 836, 840 (4th Cir. 1990) (defendant must establish that "the infringing mark is not used as a trademark"). Here, DG undisputedly used the Infringing Marks as marks.

34

Finally, DG baldly asserts several arguments and seeks to incorporate its briefing below.  Opening Br. 30 (arguing that the district court failed to properly weigh "numerous third-party uses of DEWBERRY and/or '-berry' marks; Dewberry Engineers' failure to police its marks; and the limited markets in which Dewberry Engineers uses its DEWBERRY marks") (citing summary-judgment briefing).  These arguments are not developed, and therefore waived.  *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument … by failing to develop [it]—even if its brief takes a passing shot at the issue.").  But even if this Court considers them, they fail—DG cannot show any other uses of "Dewberry" for related services, JA3987-88, and undisputed evidence showed that Dewberry performs development-related services in the same geographic markets as DG, SOC at 4-6, and polices its marks through litigation (like this case, and the Prior Litigation), and diligent management and supervision of its service marks' use, *id*. at 5-6.

## 2.    DG's marks are similar to Dewberry's.

The district court properly held that the parties' marks are similar, because they share the identical dominant and distinctive term "Dewberry."  JA4098.  *See also* 4 McCarthy § 23:42 ("It is appropriate … to give greater weight to the important or 'dominant' parts of a composite mark ….").  That is consistent with DG's own admission that "Dewberry Capital" was "extremely similar" to Dewberry's marks

"because of the common use of the predominant element 'Dewberry,'" and the PTO's repeated refusals of the Infringing Marks for the same reasons. *See* SOC at 7, 13-16.

DG responds that because the CSA authorized the use of "Dewberry Capital" (with restrictions), and because DG's "rebranding" merely switched one generic term ("Capital") for others ("Group," etc.), the new marks can't be confusingly similar. Opening Br. 31. That, again, misreads the CSA, which allowed use of only "Dewberry Capital" for a reason. SOC at 9. As DG itself admits, "Dewberry Capital" distinguished the parties' marks by implying financial services, while the rebranded marks were a better "match" for real estate development services, which are covered by Dewberry's marks. SOC at 11. Clearly DG believed the change from "Capital" mattered, as it considered rebranding a "top priority" and "huge differentiator" for the business. *Id*.

DG also argues that Dewberry's mark, combined with the berry logo, refers to a fruit, whereas DG's mark refers to its owner, John Dewberry. Opening Br. 31. But DG provided no evidence that consumers interpret the parties' "Dewberry" marks this way. In any event, as the district court correctly explained, the dominant portion of the marks ("Dewberry") receives more weight, and is identical. JA4098 (collecting cases).

36

### 3.    The services identified by the marks are similar.

The district court rightly found the similarity of the parties' services weighs in Dewberry's favor.  JA4099.  Indeed, DG itself admitted before the Prior Litigation that the parties' services are "legally related" and "travel in the same channels of commerce."  SOC at 6.  The PTO also concluded that the parties' services were "highly related."  SOC at 13.  And DG now admits that these services have "not change[d]" since then.  Opening Br. 32.

Below, DG split hairs over immaterial distinctions between the parties' services, *e,g.*, JA221-24, but now largely abandons this argument.  Rather, DG merely faults the district court for relying on the trademark-registration descriptions of Dewberry's services (which include evidence that Dewberry actually performs these services, *e.g.*, JA1380-436), Opening Br. 32.  Then it baldly asserts, in a single sentence, that Dewberry performs only architectural and engineering services.  *Id.* (citing DG's brief below).  This is another "passing shot" incorporating lower-court briefing by reference, and is therefore waived.  *Grayson*, 856 F.3d at 316.

Regardless, uncontroverted evidence shows that, in addition to architectural and engineering services, Dewberry performs real estate development and related services identical or very similar to DG's, including:

- site selection, acquisition, and development;

- zoning, permitting, and entitlements;

37

- interior design;

- construction management;

- commercial real estate financing, leasing, and property management.

SOC at 4. In addition, the parties service overlapping geographical markets, *id*. at 4-6, and even have overlapping customers, *id*. at 17, as the district court correctly held, JA4099-100.

Moreover, the parties' services need merely be "related," not identical. *Renaissance*, 227 F. App'x at 244. Ultimately, the question is whether the public will assume they "emanate from the [same] trade mark owner." *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir. 1984). Here, Dewberry's letters of protest identified 14 companies performing, under a single mark, services performed by both Dewberry and DG. JA486-538. The PTO agreed that the parties' services "are often associated with a single source and targeted at the same consumers," citing its own examples. JA1783-808; JA2018-43; JA2272-97. DG has no answer to this evidence.

Further, "complementary" services are "particularly vulnerable to confusion." *Commc'ns Satellite Corp. v. Comcet, Inc.*, 429 F.2d 1245, 1253 (4th Cir. 1970). Here, the parties' services are at least complementary, as John Dewberry himself recognized when he tried to "partner" with Dewberry on a commercial development project, JA2470-71, and even to buy the company outright, JA4004 at 35:13-15.

38

**4.    The "similarity of the facilities used by the markholders" is irrelevant.**

The district court held that the similarity of the parties' facilities benefits neither party, JA4099, which DG does not dispute on appeal.

**5.    The parties have similar advertising.**

The district court correctly found that the similarity of the parties' advertising also weighs in Dewberry's favor.  JA4099-100.  It explained that both parties provide and market development-related services in Virginia, Florida, and Georgia. *Id*.  Both parties advertise to similar targets, such as "tenants of office and retail space, real estate brokers and lenders," and both advertise design services in the *Architectural Record*.  *Id.*

DG claims the district court placed undue weight on its advertising in *Architectural Record*, since that story featured DG's hotel.  Opening Br. 33.  But DG advertised "Studio Dewberry" as the "architect" of that hotel, JA3619—information DG itself provided to the publication, JA1261-63 ¶¶92-97.

More important, the parties use the same kinds of advertising—including websites, leasing brochures, signs, letterhead, and social media—and the advertisements look strikingly similar.  SOC at 17-18; JA1190-95; JA2358-61 ¶¶43-47.  DG's LinkedIn page even lists Dewberry in the "People Also Viewed" section.  JA2359-60 ¶45.  These similar advertisements target overlapping service areas and customers, SOC at 4-6, 17, further elevating the likelihood of confusion, *see Pizzeria*

39

*Uno*, 747 F.2d at 1535 (explaining importance of "geographic overlap"). And DG itself admitted before the Prior Litigation that the parties offer services in the same "channels of commerce." SOC at 6.

### 6. DG intentionally infringed.

The district court correctly held that DG's intentional infringement weighs in favor of Dewberry. An "intent to confuse the buying public" is "strong evidence establishing [a] likelihood of confusion," *Pizzeria Uno*, 747 F.2d at 1535, and creates "a presumption [of] a likelihood of consumer confusion," *Osem Food Indus. Ltd. v. Sherwood Foods, Inc.*, 917 F.2d 161, 164 (4th Cir. 1990). As the "second comer" to the market, DG had "a duty to so name and dress [its] product as to avoid all likelihood" of confusion. *Amp Inc. v. Foy*, 540 F.2d 1181, 1187 (4th Cir. 1976). But DG did the opposite, deliberately infringing Dewberry's marks despite nine "red flags." SOC at 7-18. DG's desire to "partner" with or purchase Dewberry, *supra* at 39, also suggests intent to capitalize on association with Dewberry—which the district court later found "consistent with a motive to infringe." JA4371.

In response, DG theorizes that the CSA granted blanket permission to use "Dewberry" marks other than "Dewberry Capital." Opening Br. 34-35. That argument fails for reasons already stated, *see supra* at 29-31, and also fails to address the numerous other red flags.

### 7.     DG's infringement caused actual confusion.

"[E]vidence of actual confusion is often paramount in the likelihood-of-confusion analysis." *CareFirst of Md., Inc. v. First Care, P.C.*, 434 F.3d 263, 268 (4th Cir. 2006). "Any evidence of actual confusion is strong proof of … a likelihood of confusion." 4 McCarthy § 23:13.

The district court properly found this factor to weigh in Dewberry's favor. JA4101-02. The uncontroverted record shows more than a dozen known confusion incidents, including at least seven with one of Dewberry's biggest clients. SOC at 19-21 (listing, among others, confusion involving a vendor, tenant, architect, contractor, journalist, and potential clients). In addition, Dewberry's uncontested survey evidence shows that 20% of respondents actually confused "Dewberry Group" for Dewberry, SOC at 21—"clear evidence" of actual confusion, *RXD*, 986 F.3d at 373 (confusion rate over 10% "supports" a finding of actual confusion, while 17% is "clear evidence").

DG does not dispute these instances occurred, but merely asserts that they "occurred prior to Dewberry Capital['s] name change, did not involve purchaser confusion, and/or related to The Dewberry Hotel," again incorporating its summary-judgment briefing by reference. Opening Br. 35. Once again, such "passing shots" fail to preserve these arguments. *Grayson*, 856 F.3d at 316.

41

The arguments also fail. More than five incidents occurred after Dewberry Capital's name change. SOC at 19-21. And the district court correctly observed that the rebranded marks would cause "more confusion, not less" since they lacked the distinguishing financial connotation of "Capital." JA4102. Also, several incidents *did* involve purchaser confusion, SOC at 19-20, although purchaser confusion isn't necessary, *Ga. Pac. Consumer Prods., LP v. Von Drehle Corp.*, 618 F.3d 441, 453 (4th Cir. 2010) (allowing consideration of "confusion among the non-purchasing public"). Finally, only one incident involved The Dewberry Hotel. JA7344-45 ¶¶19-21.

DG also argues that Dewberry never informed it of these confusion incidents. Opening Br. 35. But that is irrelevant to whether confusion occurred. Moreover, Dewberry did inform DG of confusion "in both the Charlottesville area and the Northern Virginia area," SOC at 15, and DG even experienced confusion itself, *id.* at 20-21.[9]

### 8. The quality of the defendant's product is irrelevant.

The district court found the quality factor irrelevant, observing that it generally applies in cases involving infringing goods, not services. JA4102. DG

---

[9] The CSA did not require Dewberry to notify DG of confusion, only that "the parties shall, in good faith, attempt to dispel the confusion," JA1199 ¶B.9, which Dewberry did by correcting the confused parties, JA2851 ¶¶15-17; JA2356 ¶36; JA2370-72 ¶¶17-23.

does not dispute this on appeal.  In any event, Dewberry has a sterling reputation, while DG has been tarred by negative publicity.  SOC at 5, 19-21.

### 9.    The sophistication of the consuming public favors neither party.

DG's conclusory assertion that it has "an extremely sophisticated customer base," Opening Br. 51, is unavailing.  DG doesn't refute the district court's finding that both sophisticated customers and the general public confused the parties, and that such confusion, coupled with DG's negative publicity, damaged Dewberry's positive "reputational standing" and "dilutes" its $100-plus million recent "investment into goodwill."  JA4104.  Ample uncontroverted evidence supports this finding.  SOC at 19-21.

### B.    DG's "prior use" defense is barred and fails on the merits.

Unable to overcome the likelihood-of-confusion ruling, DG tries to resurrect its moribund "prior use" argument from the Prior Litigation, claiming superior rights to "Dewberry" because it has purportedly used "Dewberry Capital" since 1989. Opening Br. 23-26.  Tellingly, while DG leads with this argument now, it was just one page in its summary-judgment motion below.  JA215-16.

DG wrongly claims the district court failed to consider this argument. Opening Br. 24.  As the court confirmed in a subsequent order, it rejected the argument when granting summary judgment for Dewberry.  JA4428 (holding that the "senior user" issue was "an argument that Plaintiff prevailed upon").  Regardless,

this Court can "affirm on any ground fairly presented in the record." *Attkisson v. Holder*, 925 F.3d 606, 622 (4th Cir. 2019).

There were ample grounds to reject DG's argument. For starters, it is barred by CSA ¶ B.15, which releases Dewberry from "any and all claims" that DG "has asserted in, or could have asserted in" the Prior Litigation. DG raised its "prior use" claim in the Prior Litigation, but dismissed it with prejudice. SOC at 7, 10. Also, ¶B.8 prohibits DG from "challeng[ing] or tak[ing] action against Dewberry's federal trademark registration." DG's prior-use argument does just that by challenging Dewberry's "exclusive right" to use its registered marks under 15 U.S.C. § 1115(a). Indeed, DG expressly argued below that "[b]ecause [Dewberry] is not the senior user ..., *its registration is not entitled to nationwide protection*." JA216 (emphasis added). Finally, it does not matter that this challenge is styled as a "defense" and not an affirmative claim. *E.g.*, *Beer Nuts, Inc. v. King Nut Co.*, 477 F.2d 326, 327-28 (6th Cir. 1973) (settlement agreement that precluded "contesting [a] mark's validity" barred an infringement "defense" amounting to "an attack upon the validity of the trademark").

This argument also fails on the merits. DG didn't start using the Infringing Marks until 2017, long after the first use dates in Dewberry's registrations ("at least as early as" 2003). SOC at 11. To obtain priority, DG must "tack" the Infringing Marks to its prior use of "Dewberry Capital," which requires that these marks "create

the same, continuing commercial impression." *Hana Fin., Inc. v. Hana Bank*, 574 U.S. 418, 422 (2015). They do not, as DG admits that "Dewberry Capital" carries the commercial impression of a private equity business, while the Infringing Marks don't. SOC at 11. Also, DG didn't argue "tacking" in its opening brief, so that argument is waived. *Grayson*, 856 F.3d at 316. Finally, even if DG could tack, Dewberry would still have priority, because it was known as "Dewberry" long before Dewberry Capital was founded. *E.g.*, JA2831-32 ¶¶9-11, JA7600-611, JA2514-16, JA3801-05 ("Berry" logo adopted in 1980 "to reinforce" "Dewberry").

## III. The district court properly exercised its discretion in granting the permanent injunction.

"An injunction is the preferred remedy" for trademark infringement. *Lone Star*, 43 F.3d at 939. It is warranted when "(1) [the movant] has suffered an irreparable injury; (2) remedies available at law are inadequate; (3) the balance of the hardships favors the party seeking the injunction; and (4) the public interest would not be disserved by the injunction." *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 126 (4th Cir. 2011). A decision granting an injunction is reviewed for abuse of discretion, with underlying factual findings reviewed for clear error. *Id.* at 125.

Here, the district court acted well within its discretion in finding that all four factors were met. JA4152-58. DG challenges Factors 2 and 4 on appeal, but to no avail. *See* Opening Br. 52.

45

For Factor 2, DG suggests the disgorgement award was an adequate legal remedy, *id.*, which is wrong for multiple reasons. First, disgorgement redresses only past infringement by awarding past profits, while the injunction protects against future harm, as the district court correctly explained. JA4156-57. And given DG's pervasive intentional infringement, the court found that DG would "continue to infringe the Dewberry Marks and violate … the CSA" unless it was "permanently enjoined from doing so," JA4157—a finding reviewed for clear error, *PBM Prods.*, 639 F.3d at 125. Second, the court also properly observed that "'[i]njunctions are appropriate in trademark cases where [as] here, the reputation of the senior user is left to the mercy of [a] junior user, whose business policies may not reflect the same sound judgment.'" JA4156 (quoting *Blumenfeld Dev. Corp. v. Carnival Cruise Lines, Inc.*, 669 F. Supp. 1297, 1321 (E.D. Pa. 1987)).[10]

For Factor 4, DG postulates that the injunction is "against the public interest" because it unlawfully restrains "third parties," Opening Br. 51, presumably referring to the injunction's inclusion of DG's "officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation" with

---

[10] Additionally, "disgorgement of profits under § 1117(a) is equitable, not legal." *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1075 (9th Cir. 2015). It therefore cannot constitute an adequate remedy "available at law." *See also* 15 U.S.C. § 1117(a) (providing for disgorgement under "principles of equity").

them, JA4159.  But that language tracks Rule 65(d)(2) verbatim, which expressly allows these parties to be bound.

Finally, DG resorts again to the "surname" defense.  Opening Br. 52.  But the injunction only prohibits DG from using "Dewberry" as a trade "name or mark," JA4159, and does not prevent John Dewberry from otherwise using his name, as Dewberry explained below, JA4120-25.  The surname defense therefore does not apply.  *Supra* at 34.

## IV.  The district court properly exercised its discretion by awarding $43 million in disgorgement of profits.

The Lanham Act expressly authorizes disgorgement of profits, 15 U.S.C. § 1117(a), in order to "take all the economic incentive out of trademark infringement," *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 340 (5th Cir. 2008).  A disgorgement award is reviewed for abuse of discretion, with factual findings reviewed for clear error.  *Synergistic*, 470 F.3d at 170.

During a three-day bench trial, the district court heard live testimony from six witnesses, JA4369-70, and admitted over 500 exhibits, *see* JA4134-50, JA7013-25, and extensive deposition designations, ECF218, JA4172-73.  The court then exercised its broad discretion to order disgorgement of profits generated from DG's infringement.  JA4367-96.  On appeal, DG mounts three challenges to the disgorgement award, each of which fails.

### A.    The district court properly applied the *Synergistic* factors.

DG first claims that disgorgement was not warranted under the six non-exhaustive guiding factors in *Synergistic*, 470 F.3d at 176. Opening Br. 36-39. But the district court properly considered these factors, and was well within its discretion in awarding disgorgement.

### 1.    DG had the intent to confuse and deceive.

On the first factor, the district court correctly found that DG intended to confuse or deceive. JA4381. This factor hinges on "whether there has been a willful infringement" or the "defendant has acted in bad faith." *Synergistic*, 470 F.3d at 175. As explained above, DG persistently infringed Dewberry's Marks despite numerous warnings that its conduct was unlawful. SOC at 7-18. Based on unrebutted evidence of these warnings, the district court had earlier held in awarding summary judgment that DG had intentionally infringed. JA4100-01. In awarding disgorgement, the district court properly held that the trial record "bolstered" this conclusion, characterizing these warnings as nine "red flags." JA4370-78.

Both John Dewberry and Groce (DG's former general counsel) tried to distance themselves from the numerous "red flags," but the court found that their "testimony throughout trial was not credible." JA4374. For example, the court rejected John Dewberry's testimony that Groce kept him "in the dark" on his trademark investigations, as that testimony was contradicted by documentary

evidence. JA4373. The court also held that John Dewberry's failure to inform Groce of the Prior Litigation or CSA constituted "further evidence of willfulness, as [he] hoped that neither Gross nor [Dewberry] would raise objections." JA4373. And it found "troubling" that after Groce apologized to Dewberry for prosecuting the "Dewberry Group" mark, he was "essentially stripped of responsibility" for the dispute with Dewberry and prosecution of the other Infringing Marks. JA4376. These findings are reviewed for clear error, and there was none.

DG's only answer to these findings it to assert, in one sentence, that Dewberry failed to present evidence that DG specifically "intended to capitalize on [Dewberry's] goodwill." Opening Br. 37. But even if this specific intent were required, the district court correctly found that DG had "ample financial motivation" to align itself with Dewberry's marks JA4370-71. For example, John Dewberry attempted "to purchase Dewberry Engineers multiple times," revealing his "desire to obtain a connection with [Dewberry] and its marks." JA4371. *See also* JA4004 at 35:13-15 ("[John Dewberry] right off from the beginning, wanted to buy my firm. He wants to do business with me."). This desire was further evidenced by his attempt to "partner" with Dewberry on a development project. JA2470-71. Additionally, DG's intent "to profit from [Dewberry's] reputation" is clear, given its "attempts to make [its] signs, advertisements, etc., to resemble [Dewberry's]." *Pizzeria Uno*, 747 F.2d at 1535. *See also* SOC at 17-18.

49

DG wrongly claims the district court erred by relying on "a single cease and desist letter" it sent before the Prior Litigation.  Opening Br. 53.  As already noted, the district court relied on *nine* different "red flags," not just DG's cease-and-desist letter.  SOC at 7-18.  Plus, the letter was itself powerful evidence, since it conceded that "Dewberry Capital" was confusingly similar to Dewberry's marks.  *See* SOC at 6-7.  The district court's reliance on it was not clearly erroneous.

Nor does it matter that DG argued to the PTO the marks were not confusingly similar.  Opening Br. 53.  That isn't indicative of DG's actual mental state, and, anyway, the PTO rejected it, providing yet more "red flags" alerting DG to its untenable position.  JA4371.  DG claims the court improperly weighed these "initial" refusals.  Opening Br. 54.  But these refusals were reaffirmed multiple times, SOC at 16, and this Court has given such refusals "great weight," *Pizzeria Uno*, 747 F.2d at 1534.  *See also Murphy Door Bed Co., Inc. v. Interior Sleep Sys., Inc*., 874 F.2d 95, 101 (2d Cir. 1989) (same).

## 2. Dewberry did not need to show that its sales were directly diverted by DG's infringement.

DG next argues that Dewberry "presented no evidence whatsoever of any diverted sales."  Opening Br. 37.  But as the district court correctly explained, Dewberry did not need "direct evidence" of diverted sales.  JA4381-82 (citing *Exclaim Mktg., LLC v. DirecTV, LLC*, 674 F. App'x 250, 257 (4th Cir. 2016)).  It was enough that "the parties operate in overlapping markets and market to the same

50

kinds of parties," JA4381-82, as demonstrated by uncontroverted evidence, SOC at 4-6, 17.

### 3. Other remedies are inadequate.

DG argues that Dewberry's injunction should have been sufficient because Dewberry presented no evidence of "lost sales or any other actual damages." Opening Br. 37. But, as just observed, the Lanham Act doesn't require proof of lost sales or actual damages. *See also* 5 McCarthy § 30:63 ("[P]laintiff need not demonstrate … actual damages to obtain an infringer's profits."). As the district court correctly reasoned, an injunction alone wasn't sufficient because it would not address past injuries, and may not sufficiently deter DG given its persistent intentional misconduct. JA4382.

The reality is that DG is simply throwing up arguments and hoping one will stick. Here, it contends that disgorgement was inappropriate because the injunction was an adequate remedy. Opening Br. 37. But earlier, DG asserted that the *injunction* was inappropriate because *disgorgement* was an adequate remedy, Opening Br. 52. As explained, both are appropriate because they address different harms.

### 4. Dewberry did not unreasonably delay in asserting its claim.

DG claims that Dewberry unreasonably delayed by filing suit 2.5 years after its first cease-and-desist letter. Opening Br. 37-38. But as the district court found,

Dewberry spent most of this time attempting to persuade DG to stop infringing, after being misled by Groce's "false assurances" that DG would do so.  JA4375, 4382-83, 4394.  Dewberry also spent time filing letters of protest with the PTO after DG refused to abandon its applications.  *See supra* at 15.  *See also Gaudreau v. Am. Promotional Events, Inc.,* 511 F. Supp. 2d 152, 159 (D.D.C. 2007) ("Numerous courts have recognized that pursuing an opposition in the USPTO excuses delay in filing suit on a Lanham Act claim.").  Accordingly, any delay was caused mainly by DG itself.  There is no clear error here.

### 5. The public interest weighs in Dewberry's favor.

The district court correctly held that the public interest weighs in favor of disgorgement, since it deters DG and others from future infringement.  JA4383-84.  DG's only response is that the district court failed to give proper weight to the "Coexistence Agreement" and surname defense, Opening Br. 38, but these arguments fail for reasons already discussed, *supra* at 29-31, 34.

### 6. The "palming off" factor is inapplicable, and does not change the outcome.

DG argues the district court erred in granting disgorgement after finding that this was not a case of "palming off."  Opening Br. 37.  DG cites no authority that disgorgement is available only in cases of palming off.  Rather, it is merely one of the non-exhaustive factors to be "considered."  *Synergistic,* 470 F.3d at 171, 176.  Moreover, any absence of explicit "palming off" does not negate the extensive

evidence of DG's intent to confuse and deceive previously discussed. *Supra* at 48-50.

### B.    The district court properly exercised its "broad discretion" in considering the profits of the entire DG enterprise.

When awarding disgorgement, the Lanham Act provides courts "discretion [to] enter judgment for such sum as the court shall find to be just, according to the circumstances of the case" and "the principles of equity." 15 U.S.C. § 1117(a). This gives courts "broad discretion to award any monetary relief necessary to serve the interests of justice." *Shell Oil Co. v. Com. Petroleum, Inc.*, 928 F.2d 104, 108 (4th Cir. 1991). Here, the district court acted well within that "broad discretion" when it calculated profits based not only on DG's financial statements, but those of the Ownership Entities. And it did so based on factual findings that were not clearly erroneous, but rather amply supported by the record.

Following trial, the district court correctly rejected DG's argument that it had generated $0 in profit related to the infringement. JA4385. DG argued that because its individual financial statements showed losses of millions of dollars a year, JA6462 ¶41, Fig. 3; JA6736-7012, there were no profits to disgorge, JA4332 at 35:5-18. But the district court found as a fact that DG's financial statements "do not tell the whole economic story," because no "business could continue … after decades of losses like these." JA4385-86. DG survived only because of cash infusions from

John Dewberry personally—$23 million over the last 30 years.  *Id.* (citations omitted).

Instead, the district court correctly agreed with Dewberry's expert, Rod Bosco, and found as fact that the profits generated by DG's services using the Infringing Marks were being recognized by affiliated Ownership Entities.  JA4384-88.  It found these "single-purpose entities," JA4384, also under John Dewberry's control, owned "properties managed and serviced by Dewberry Group," but "do not and cannot perform the work and services necessary to generate revenues" for those properties, JA4385-86.  Yet "all revenues generated through [DG's] services show up exclusively on the Ownership Entities' books."  JA4386.  So while DG was recording losses, the Ownership Entities were recording massive profits—$53 million from 2018-2020 alone.  JA4388.[11]

Far from being clearly erroneous, these factual findings are amply supported by the record.  For starters, DG *itself* advertises the Ownership Entities' properties as part of DG's unified business.[12]  These entities also have no offices (their

---

[11] The disgorgement award was calculated based on profits between 2018-2020, as this was the only financial information DG provided.  JA4201-02 at 4:8-5:2; JA4205-09 at 15:18-19:6.  This understated the actual infringement-period profits, since infringement was ongoing during 2017, *supra* at 11-19, and through May 2022, when the injunction finally took effect, JA4409.

[12] *See, e.g.,* JA6404-09 (advertising that "Dewberry Group" holds a "property portfolio" of "luxury multi-family residential, and prestigious retail projects");

54

registered address is DG's headquarters).  JA4298-99 at 33:25-34:15.  And they have no employees (with the hotel as a partial exception).  JA6580-84 ¶¶4-10, JA6586-6600 ¶¶15-39; JA4298 at 33:16-23; ECF232 at 137:12-138:9.  Instead, they rely exclusively on DG to promote, manage, and operate all of these properties using the Infringing Marks.  *E.g.*, JA6587-6600 ¶¶19-39; JA4193-96 at 80:13-83:23; ECF237 at 9:16-22:6, 24:4-32:16.

On these facts, the district court properly exercised its broad equitable authority to rely on the Ownership Entities' financial statements when "calculating the revenues and profits generated" by DG's infringement.  JA4385-87.  It found that to "allow [DG's] non-arms' length corporate dealings … to trump the economic reality of how [DG's] business operates" would "undermine the … Lanham Act[]" by allowing DG "to evade the financial consequences of its willful, bad faith infringement."  *Id*.  *See, e.g., Am. Rice,* 518 F.3d at 339 (allowing disgorgement of profits earned by defendant cooperative but realized by non-party members).  That was entirely appropriate.  Because DG's non-arms' length financial statements didn't reflect the profits generated by its infringing services, the district court

---

JA6437-38 (advertising that "Dewberry Group" has "a portfolio of properties" in "Atlanta, Jacksonville, Charlottesville, and Richmond, Virginia," with "current assets" of "approximately $1.6 billion").

properly considered other financial evidence to "tell the whole economic story." JA4386.

Moreover, the court's award did not require it to "pierce the corporate veil," nor did it, as DG argues. Opening Br. 44. Veil piercing is required only to "impose liability directly" on another party. *Bennett v. Garner*, 913 F.3d 436, 443 (4th Cir. 2019). Here, the district court did not impose any judgment on the Ownership Entities; it merely considered their finances as *evidence* when exercising its "broad discretion," *Shell Oil*, 928 F.2d at 108, to "enter judgment for such sum as the court shall find to be just," 15 U.S.C. § 1117.

For this reason, the district court did not have it "both ways" by treating the Ownership Entities and DG as separate in concluding, on summary judgment, that DG had performed infringing "services" for separate corporate entities. Opening Br. 44. Again, even if the Ownership Entities are separate corporate entities, that doesn't prevent the court from considering the profits DG generated for them through its services using the Infringing Marks when calculating an award against DG.[13]

---

[13] Further, the district court correctly noted that its prior treatment of the issue "did not control the Court's holding" on summary judgment. JA4385. Rather, the court cited evidence that DG provided "services" for the benefit of numerous third-parties and not merely the Ownership Entities. JA4091-92. This is undisputed. *E.g.*, JA464 (DG's "services" are "directed to potential tenants"); JA3266 (DG's "main clients" are third-party corporate "tenants leasing space" in the properties it serves).

### C.     The district court properly accounted for costs.

DG next argues that the district court "failed to consider the [Ownership Entities'] costs" in calculating the disgorgement award—costs which DG purportedly "presented into evidence" as "profit and loss" statements. Opening Br. 45. For starters, DG is incorrect that it was Dewberry's burden to identify "revenue … attributable to" DG's infringement. Opening Br. 35-36. It is the plaintiff's burden to identify "sales only," while the defendant must prove "all elements of cost or deduction claimed." 15 U.S.C. § 1117(a). *See also Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.,* 316 U.S. 203, 206–07 (1942) ("The burden is the infringer's to prove that his infringement had no cash value in sales made by him."); JA4342-43 at 58:24-59:6 (DG conceding at trial that "it is the defendant's burden to prove any deductions … for revenue that is not attributable to the mark").

DG could not satisfy this burden by simply putting profit-and-loss statements "into evidence" without any analysis of how any reported costs were properly and reasonably deducted against the infringement period revenues. DG and its expert admittedly "'did no actual calculations'" of costs and "did not do a 'profits analysis.'" JA4393. DG made the strategic decision to claim it had no profits to disgorge, without analyzing the costs that led to that conclusion.

Nonetheless, Dewberry's expert, Bosco, *did* account for these costs (though it was not Dewberry's burden to do so), using the very "profit and loss" statements DG

claims the district court ignored.  JA6607-08 ¶¶58-59.  The court's disgorgement award was based on Bosco's calculations, and thus did account for operating costs. Moreover, DG shouldn't be heard to complain about any arguable imprecision in accounting for its costs since it failed to satisfy its burden of analyzing them.

DG also faults the district court for not considering DG's *own* costs as reported solely on its books (as opposed to the Ownership Entities), Opening Br. 45, which fundamentally misunderstands the disgorgement award.  This award derives from the financial statements of the *Ownership Entities*, not DG.  JA6733.  DG's income (which consists solely of fees paid by these entities) is a *cost* incurred by the Ownership Entities, and was therefore *deducted* from the disgorgement award. JA6458 ¶29.  Accordingly, DG's own costs are irrelevant.[14]

Finally, DG is also wrong in arguing that the district court "arbitrarily reduced the award by twenty percent" instead of accounting for costs.  Opening Br. 45-46. This 20% reduction was *in addition* to accounting for costs, not *instead* of that.  *See* JA4392.  Nor was this reduction impermissibly "arbitrary," Opening Br. 46, as the district court has broad equitable discretion to "enter judgment for such sum as the

---

[14] DG's costs *would* be relevant only if disgorgement were instead calculated based on *DG's* financial statements, as DG urges.  Even in that case, Dewberry would be entitled to disgorgement of DG's revenues during the infringement period, because DG failed to carry its burden of proving that any of its own costs were properly deductible from them.  JA6608-09 ¶60.  Those revenues were $7.96 million for 2017-2019, or $6.6 million if 2017 is omitted.  JA6462 ¶41.

court shall find to be just," 15 U.S.C. § 1117(a).  Finally, DG complains that some of the profit-generating leases predate the infringing marks, Opening Br. 16, but the 20% reduction already accounted for that, JA4392.

**V.    The district court properly awarded Dewberry fees and costs.**

The Lanham Act provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party."  15 U.S.C. § 1117(a).  "District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances."  *Verisign, Inc. v. XYZ.COM LLC*, 891 F.3d 481, 487 (4th Cir. 2018) (citation omitted).  A decision to award fees is reviewed for abuse of discretion, *id*. at 484, with underlying factual findings reviewed for clear error, *Express Homebuyers USA, LLC v. WBH Mktg., Inc.*, 791 Fed. App'x 396, 398 (4th Cir. 2019).

Here, the district court properly concluded that this is an "exceptional case" because of DG's "bad faith, intentional misconduct."  JA4394.  DG not only infringed in bad faith, it "pervasively breached the CSA over [Dewberry's] objection, in contravention of its general counsel's false assurances, and in the face of multiple red flags."  *Id*.  These findings were amply supported by the record, SOC at 7-16.

On appeal, DG claims the district court "ignored this Court's three-factor test for determining whether a case is exceptional."  Opening Br. 56 (quoting *Georgia-*

*Pacific Consumer Prods. LP v. von Drehle Corp.*, 781 F.3d 710, 721 (4th Cir. 2015)). But as *Verisign* explains, these factors merely provide guidance for an individualized "case-by-case" inquiry, based on the "totality of the circumstances." 891 F.3d at 487. That is why *Georgia-Pacific*'s third prong is a catch-all, allowing fee awards when "there is otherwise the need in particular circumstances to advance considerations of compensation and deterrence." 781 F.3d at 721. Under this catch-all, bad faith infringement is sufficient to make a case "exceptional," as this Court and many others have found. *E.g.*, *Scotch Whisky Ass'n v. Majestic Distilling Co.*, 958 F.2d 594, 599 (4th Cir. 1992) (allowing fee awards when defendants "act[] in bad faith," to discourage "[d]eliberate and flagrant infringement of trademarks"); *Spectrum Ass'n Mgmt. of Tex., L.L.C. v. Lifetime HOA Mgmt. L.L.C.*, 5 F.4th 560, 567 (5th Cir. 2021) (allowing plaintiff to recover fees when the defendants "engaged in willful, bad-faith infringement"). In addition, DG's intentional breach of the CSA is itself sufficient to make the case "exceptional" as well. *E.g.*, *Am. Farm Bureau Fed'n v. Ala. Farmers Fed'n*, 935 F. Supp. 1533, 1553 (M.D. Ala. 1996); *Mya Saray, LLC v. Al-Amir*, 831 F. Supp. 2d 922, 937 (E.D. Va. 2011).

DG also argues that "no evidence shows [it] changed its name to create confusion or take advantage of Dewberry Engineers' mark or goodwill." Opening Br. 57. That is not true, for reasons already explained. *Supra* at 48-50. And finally, DG's argument that the fee award should be reduced for Dewberry's "unsuccessful"

contract claim also fails, Opening Br. 57 n.8, because this claim was successful, *supra* at 31-32.

## **CONCLUSION**

This Court should affirm.

Dated:  January 13, 2023          Respectfully submitted,

                                  /s/  Elbert Lin

Arthur E. Schmalz                 Elbert Lin
HUNTON ANDREWS KURTH LLP          Stephen P. Demm
2200 Pennsylvania Ave. NW,        Brian A. Wright
Washington, DC 20037              David M. Parker
202-955-1500                      HUNTON ANDREWS KURTH LLP
*aschmalz@huntonAK.com*           Riverfront Plaza, East Tower
                                  951 East Byrd Street
                                  Richmond, VA 23219-4074
                                  804-788-8200
                                  *elin@huntonAK.com*
                                  *sdemm@huntonAK.com*
                                  *wrightb@huntonAK.com*
                                  *dparker@huntonAK.com*

                                  *Attorneys for Plaintiff-Appellee Dewberry Engineers Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.     This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i) because this brief contains 12,614 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman 14-point font.

Dated:  January 13, 2023          Respectfully submitted,

                                   */s/  Elbert Lin*

Arthur E. Schmalz                  Elbert Lin
HUNTON ANDREWS KURTH LLP           Stephen P. Demm
2200 Pennsylvania Ave. NW,         Brian A. Wright
Washington, DC 20037               David M. Parker
202-955-1500                       HUNTON ANDREWS KURTH LLP
*aschmalz@huntonAK.com*            Riverfront Plaza, East Tower
                                   951 East Byrd Street
                                   Richmond, VA 23219-4074
                                   804-788-8200
                                   *elin@huntonAK.com*
                                   *sdemm@huntonAK.com*
                                   *wrightb@huntonAK.com*
                                   *dparker@huntonAK.com*

                                   *Attorneys for Plaintiff-Appellee Dewberry Engineers Inc.*

## CERTIFICATE OF SERVICE

I certify that on January 13, 2023, I electronically filed the foregoing with the Clerk of Court through the Court's CM/ECF system. The participants in the case are registered CM/ECF users, and service will be accomplished through the CM/ECF system.

Dated: January 13, 2023                    Respectfully submitted,

                                           */s/  Elbert Lin*

Arthur E. Schmalz                          Elbert Lin
HUNTON ANDREWS KURTH LLP                   Stephen P. Demm
2200 Pennsylvania Ave. NW,                 Brian A. Wright
Washington, DC 20037                       David M. Parker
202-955-1500                               HUNTON ANDREWS KURTH LLP
*aschmalz@huntonAK.com*                    Riverfront Plaza, East Tower
                                           951 East Byrd Street
                                           Richmond, VA 23219-4074
                                           804-788-8200
                                           *elin@huntonAK.com*
                                           *sdemm@huntonAK.com*
                                           *wrightb@huntonAK.com*
                                           *dparker@huntonAK.com*

                                           *Attorneys for Plaintiff-Appellee Dewberry*
                                           *Engineers Inc.*

64

1